Good morning. I'm Bob Peterson. I represent Techno Coatings. The reason we're here today is the company was engaged in a lead removal project at a pier in San Diego, California. In terms of complying with the requirements of the Federal OSHA lead standard, the company had relied on technical data, which they had accumulated at a previous job site in San Bernardino, California, about six months before they had been removing lead-based paint or paint-containing lead from a bridge in San Bernardino County. Based on their interpretation of the lead standard, you can rely on historical data rather than having to conduct an initial determination of the presence of lead at the project you're working on. And that is an exception to the regulation. And frankly, in one of the cases that counsel called our recent case, we have no disagreement with the finding of the court in that case, i.e., it's an affirmative duty on our part. I think it's our burden of proof if we're going to try to establish historical data as an exception. So you do not have to do initial determination. We have to prove the validity of the historical data. Roberts. Well, the way you describe it, it sounds pretty simple. They show up, they ask you what are you doing, and you say we're relying on historical data from a comparable project. But it wasn't that simple, was it? Well, actually, I think it was, at least in terms of that determination that is made when you start that kind of a project. If you've relied on historical data that's valid, that has some reason to it, then you do not have to do the initial determination, which is really what drives this whole case. Because if you do not make an initial determination, the regulation suggests that you have to do certain things while you're – I'm sorry, if you're not using historical data, then you have to conduct an initial determination. If you don't conduct the initial determination, you have to presume there's kind of a presumption of certain things. You have to provide this, you have to provide that, et cetera. But in this case, the technicodings, because of the fact they had done the previous job just a few months before out in San Bernardino, relied on that technical data that they had accumulated there. Both the soil samples, the airborne samples, the chip samples, the fact that they were doing the job exactly the same way at San Diego that they did at San Bernardino led technicodings to believe that it could rely on the information that it had gathered at San Bernardino, the San Bernardino job, and that therefore it didn't have to conduct a second initial determination, if you will, because they knew what it was going to be already. Well, the reason I ask you if it wasn't that simple is because during the second visit, Kalinovich, or however he pronounces his name, inquired as to the type of initial exposure assessment that Techno had completed before starting the project. And Benjamin Remle said did not monitor because they relied on historical data from a similar job. And Remle agreed to provide Kalinovich with the documentation. Kalinovich then contacted Remle to obtain the documentation, but the document didn't refer to a reliance on historical data. And then the story started to change to a bridge project in San Bernardino. I mean, so it seemed to be, to use the George Foreman analogy, some rope-a-dope going on when your client was asked what are you relying on. Actually, I think it was Muhammad Ali that used rope-a-dope, but I could be wrong. But in any case, that's an interesting point you make because I think the Administrative Law Judge just simply missed it. It's like he wasn't in the courtroom with us. Here's what happened. The Secretary, in her opening comments, in her opening comments says that this, well, before that even, the citation is significant, cites the San Bernardino job. It cites it in the citation. Everybody understands that the historical data involves the San Bernardino job. And the Counsel, in her opening comment, says that this is a significant issue. The evidence will show that the place on which they purportedly relied was in San Bernardino. Now, that's on the, in the transcript. The judge, so the Administrative Law Judge, Judge Yetman, says, well, now, a little later on on page 36, he says, well, was there any historical data used? Yes, there was. Judge Yetman, tell us what it was. Historical data based on a bridge project within the preceding 12 months in San Bernardino had been utilized. What happened to the power plant that was originally represented as the source of the historical data? I have no idea. There was a comment that the industrial hygienist for Federal OSHA stated. She said, well, I asked Mr. Remley the day of the inspection. I guess he was there the second day, December 12th, and Mr. Remley mentioned something about a power plant. It never came up again. The whole case in two days of hearing dealt with whether or not the historical data that was being relied upon by technicodings was proper. Did we have enough historical data? Was our reliance on the historical data accurate? That's what this whole case was about. I don't know where Judge Yetman came up with the concept that somehow we used this rope adult theory. That just was not what this was all about. Even Federal OSHA acknowledged that. That's all we dealt with was the historical data. I'm expecting the other side to stand up and say that you're correct, that you did rely on the information that finally came before the Commission and the power plant and all the rest of that stuff was just a red herring. You know, I guess, I know Mr. Remley denied that conversation, denied that reference to the power plant during the hearing, but, you know, the fact of the matter is that Judge Yetman apparently relied upon this representation. But it's interesting in his decision. He says, well, you know, I think it was the power plant. I'm not sure Mr. Remley is credible, but, nevertheless, I'm going to deal with the technical data from San Bernardino. Okay. And so that's how we get to that. That's how we get there. But I was – I was surprised that Judge Yetman would say that, because as he himself asked on page 36 of the transcript, well, the technical data was from San Bernardino, right? Everybody knew that. For two days, we litigated that technical data. Wasn't there some question whether they really were comparable and whether there was any validity to what the tests were done in San Bernardino? They're using different pures and different types of paint and different places, and so it really wasn't comparable to what was going on in San Diego. Well, Your Honor, that's exactly what the issue was all about when you get down to it. It was a question of, well, what kind of sampling did you do in San Bernardino County? Well, don't we have to support the Commissioner unless that there's no substantial evidence to support it? We're not supposed to retry the case. No. You're not supposed to retry the case. And I think the issue is this. The Review Commission is the Review Commission. They never made – the Review Commission made no findings of fact. They didn't even review the matter. We filed a petition for discretionary review. They decided not to review it. I'm not sure that this Court – I'm not sure about this, though. I'm not sure this Court has to give the same deference to an administrative law judge's decision that it might have to give to the Review Commission if the Review Commission had reviewed the case. Well, you said you accepted the premises of this case that was just cited to us, the Third I agree. I think that is the law. I think that – and I think the judge did a nice job, or whoever wrote that decision did a nice job of summarizing that part of that decision. But again, I don't think the Commission had nothing to do with this case. So again, Your Honor, I just don't – I'm not sure that you would have to give that kind of deference to an administrative law judge's decision. I think it would have been different if the Review Commission had reviewed it and said, yeah, you know what, I think I agree with this, or I don't agree with that, or whoever was – whoever formed the Review Commission. I'm not quite sure what I – I understand what you're saying. The Review Commission didn't even read Judge Yetman's decision? They just rubber-stamped something? Well, I don't know what goes on at the Review Commission, Your Honor. All I know is when we filed a petition for discretionary review – Do you know that something improper went on, or are you just saying it's a fog and we have no idea what happened? No, I'm not saying anything improper went on. All I'm saying is we filed a petition for review. They didn't accept it for review, and they issued an order saying that, you know, that the decision of Judge Yetman was a decision of the Review Commission. That's well and good, and maybe that – they adopted it then. Maybe that warrants some kind of deference by the Court to the findings of Judge Yetman. You know, we do that frequently. We say for the reasons given by the district court in its opinion of such and so, even in published cases, we affirm. And here it's – except that it's from San Bernardino – did not meet the requirements for use of historical data. The previous operation did not have workplace conditions close or resembling the work practices, et cetera, et cetera. So they adopted that as their decision. By an order, that's – I agree. That's exactly what happened. All I'm suggesting is is that if the Review Commission itself had taken the matter up on reconsideration and had reviewed the record itself, I don't know what the outcome would have done – would have been. That's all I'm suggesting. Are you saying this is not supported by any substantial information or evidence at all? I don't think it is. I think that Judge Yetman was totally wrong. I think he was totally wrong. I think there's no evidence. He had two points that he makes, just two points that he makes. He says, one, the data from San Bernardino does not establish exposures to any degree of accuracy. Well, here we are. We're in San Bernardino. We're looking at a bridge, and we're taking paint off a bridge. And you look at the bridge, and you say, okay, it's got paint on it. We have to take it off. So what did we do? We took seven samples plus a chip sample from that bridge. There were four dirt samples. There were three airborne samples, and we took a chip sample. Now, that's a lot of samples from that bridge, and all of the three airborne samples from the bridge showed no detectable levels of lead. The dirt samples showed very small amounts of lead in the dirt. The chip sample, interestingly enough, showed 700,000 parts per million in the chip sample. Now, at San Diego, we get a chip sample from the Navy, and it says, okay, here's an example of the bridge. Here's an example of the paint you're going to be taking off of the structure here in San Diego. That chip sample was 54,000 parts per million, not 700,000, 54,000. Obviously, much lower. We now know that we have dirt samples. We have airborne samples of San Bernardino. We're doing exactly the same job in San Diego. We rely on the results of those seven samples out of San Bernardino. Four dirt, three air. We rely on those. We know now that at San Bernardino, there were 700,000 parts per million in that chip that we got out there. We've got 54,000 in San Diego. Any reasonable person is going to say, hmm, less lead exposure in San Diego. And, in fact, there was. But there's another problem, too, that Judge Yetman points out. Under Section 1926.62, documentation is required. If you're going to use historical data for the initial assessment, the documentation must include, and I quote, a record as to the relevancy of such data to current job conditions. And Judge Yetman found that, quote, Techno couldn't produce the documentation required under 1926.62d5. So you never completed a valid initial exposure assessment if you don't have documentation. Did you have documentation? That's what all the sample data from San Bernardino is for. That's what we litigated. No, no. You have to have documentation in your initial assessment. And you didn't refer to that at all, he says. Well, there are two things wrong with another two things that are wrong with Judge Yetman's decision. One, there is no requirement in the regulation for documentation for historical data. If you look at the regulation, it says, well, you've got to have, you should have some accuracy and confidentiality levels of paragraph 10d. There is no paragraph 10d in the regulation. So for Judge Yetman to suggest that there's some kind of a documentation requirement, we're coming under the exception of historical data. All we can do is read the regulation and comply with the words of the regulation that are set forth in the regulation. There's no requirement in that regulation for any documentation. They reference a paragraph, the accuracy and confidence levels of paragraph 10d, of which there is none. So what — I just — maybe perhaps we should hear from the government. But I am just having a little trouble. I wouldn't call it rope-a-dope. And I think you're right that it was, Ali, but I am having a little trouble with the notion that you can use data of what was going on in one project that is, what, 150 miles away, a different place, a different project, for another project without having some kind of documentation, that what you're doing is the same or that the historical data somehow links for that project links up to this one. Well, Your Honor, I understand your concern. Oh. It's a — it's business. It's the — the regulation provides that. The historical data provision of the regulation provides precisely that. As long as — as long as the conditions are the same, as long as the sample results are the same, the Secretary of Labor never argued that what we were doing in San Bernardino was different from San Diego. It was precisely the same job. You used abrasive tools to blast this paint off of these surfaces. Same procedure. Same everything. And in fact, like I say — What was — were you taking the paint off in San Diego? A pier. Another structure. Yeah. You just blast it off with these machines. The two employees in San Diego were using precisely the same equipment. They're in — they're in moon suits. They're in respirators. They're doing exactly what you do — what we did at San Bernardino. There were no changes in what was being done. And I think that's why the regulation says, look, if the conditions are — if the regulation uses the word closely resemble, as long as they closely resemble each other and you've got accurate historical data, then that's all you have to have to satisfy that exception, good or bad. Okay. But I'll save the last couple of minutes for rebuttal. Thank you. Thanks, Your Honor. Good morning, Your Honors. May it please the Court. My name is Lee Grable. I represent the Secretary of Labor. Mr. Peterson has made some points that this credibility determination was never part of this case. I'm going to read from the Secretary's post-trial brief, page 5 of 19. It's not included in the appendix, but the Court does have it. I believe the Court requested the record. The Secretary argued in that brief — and this is on page 5 — responded, initially reclaimed that it relied on historical data from a power plant to make its initial exposure assessment. Respondent later asserted that it relied on data from the Waterman Bridge Project in San Bernardino. Respondent provided field notes and analyses of the bridge project, but had no record to indicate that it relied on the monitoring results from the San Bernardino project in making the assessment for the San Diego project. Respondent's inconsistency and lack of documentations undermines its assertions that it conducted any kind of initial exposure assessment based on historical data before the inspection began on December 11, 2002. Respondent's failure to make an initial assessment is a violation of the standard. So this credibility determination was argued by the Secretary at the hearing level, and the judge accepted the fact that no initial determination was made in this matter based on a very strong credibility determination. But more importantly than everything that counsel is bringing up mostly for the first time during this oral presentation, TECNO has not raised this issue before the court. TECNO only obliquely references aspects of this credibility determination in a few footnotes in its brief. Therefore, the issue is not properly before the court, and the court should accept the evidence. But the Secretary never, even if the court wants to address it, the credibility determination is supported by substantial evidence. TECNO alleges that the Secretary agreed that TECNO relied on the power plant data. That's undermined by the statement I just read in the Secretary's post-hearing brief. It's also undermined by the compliance officer's testimony. The compliance officer painted the picture of an employer here who was seeking to obscure the fact that it had not relied on, it had not completed an initial determination. It was seeking to make it appear that it had relied on the power plant data in order to make it appear that it had complied with the standard. That's the compliance officer's testimony. In a footnote in its reply brief, Respondent sort of gets to the basis of its allegation that there was some kind of agreement between the Secretary and TECNO. But there was testimony, the judge asked the compliance officer, did TECNO use historical data? The compliance officer said, yes, TECNO used historical data. But that doesn't prove any agreement. At most, when it's put into the context of the compliance officer's complete testimony, again, the compliance officer paints a picture of an employer that did not comply and did not rely on this initial historical data. Alito, I also think that 2662d5 requires documentation, and I can't find any. Absolutely. And Mr. Peterson is wrong when he states that no documentation is required. I just read d5 again, and it says it is. d5 requires the employer shall make a written record of such determination, d1, 2, and 3, and that's exactly what we're talking about. Right. And in the appendix to the standard, OSHA elaborates, it says that there must be a record of the relevancy. Now, at the hearing, and I guess, again, during the appeal, the relevant documents are r-3, c-12, c-13, and c-14, which are in the Respondent's Supplemental Excerpts of Record. r-3 is a safety analysis conducted for the San Diego Pier. It doesn't mention the San Bernardino data. c-12, 13, and 14 are field notes from the bridge project. Don't mention the San Diego project. So, again, that goes to show that TECNO just did not do an initial determination here. What's at stake in this? What's at stake here? Is it a fine of? I'm not sure how much the fine is. $9,000, isn't it? But what's at stake is these employees' lives, the health, the, you know. Well, I understand in terms of the safety regulation. I'm just wondering what the employer has to lose here or gain by. Is there a debarment floating in the wind on something like this? If you have a certain number of violations, are you debarred from government contracts? I'm not sure about that, Your Honor. I don't, I know that there are insurance issues at stake. I know that oftentimes the employers have trouble getting insurance if they're found to be in serious violation of the act. I don't know about the debarment issues, though. But that's irrelevant to the court's determination here, of course. No, but we like to know what it really is. Oh, okay. Oftentimes it's an insurance issue. It's a test penalty case. Why wasn't the San Bernardino work that they did up there, why wasn't it similar, and why wasn't it reliable? Okay. It was not similar. Why not? But before I get into those reasons, I just want to point out to the Court that the Court need not even address that issue. I want to. Okay. You're better off answering the question. Okay. The San Bernardino project, what they did, they took a paint chip from a Pier 7 of the bridge. They took employee air monitoring at Pier 10 of the bridge. The judge found that the Pier 7 paint chip was not a valid indicator of the lead concentration for the employee working at Pier 10 of the bridge. And that's because even Ben Remley, the safety director, acknowledged that the different piers could have different lead concentrations. Techno's argument was this. It had this 700,000 parts per million paint chip. It had this employee exposure reading of non-detectable at Pier 10. It argues it has this 54,400 parts per million paint chip at the San Diego pier. Therefore, it argues that there's also non-detectable levels of lead at the pier. But if you don't have an adequate basis to say that the employee was exposed to the 700,000 parts per million, there's no adequate basis to compare. And that's the basis of the judge's decision. There are alternative basis for finding that these two sites were not comparable. On December 11, 2002, the first day of the inspection, the compliance officer gets to the site for an unannounced inspection. The employer is not expecting OSHA. The employer is using needle guns without vacuum attachments. Now, that's important because vacuum attachments are devices which suck up particulate. They suck up the lead so that the lead is not, so that employees are not exposed to the lead. Now, in San Bernardino, the employee was using vacuum attachments. So when you compare that, you see that the potential exposure in San Diego was higher because the work practices were not similar. And even Wembley acknowledged that exposure over the Pell in San Diego was likely if vacuum attachments were not used. Now, on December 12, all of a sudden, there were vacuum attachments. And that's because Techno was expecting OSHA to come back for the second day of the inspection and expecting some monitoring to be done. But on the first day of the inspection, no vacuum attachments. Do you, have you conceded that one of the citations is, should be vacated? The recordkeeping citation, yeah. What does that do to the case? Absolutely nothing. It has no, it has no effect. It's a standalone citation. Yeah, yeah, yeah. Now, Techno also makes an argument about the standard of review for unreviewed commission cases versus reviewed commission cases. And he argues, actually for the first time on appeal, that there may be some sort of different standard of review. That's just wrong. The standard of review is the same. The commission has an opportunity to review the decisions. If either the employer or the secretary files a petition for discretionary review, the commission can, in its discretion, not review the case. If it doesn't review the case, the ALJ decision becomes a final order of the commission. So there is no different standard between an unreviewed ALJ decision and a commission decision. And, in fact, if the commission had reviewed this case, the commission is supposed to give special credence to the credibility determinations of the ALJ. So that's an even stronger reason why the Court should affirm based upon the credibility determination. So unless the Court has any further questions about Techno's failure to complete an initial determination here, I'm going to move on now and talk about the clean change area and biological monitoring violations. Techno does not challenge the judge's finding that the secretary failed to, that the secretary, that it did not provide these interim protections during the interim period. Its arguments revolve around the judge's finding that the secretary failed to prove employee exposure over the Pell. These arguments miss the point. The point here is that the standard required Techno to perform these, to provide these interim protections prior to the completion of the, of this initial determination. The point here is that the standard required Techno to treat its employees as if they were exposed above the Pell until it completed its initial determination. Because Techno did not complete an initial determination here, for all it knew, its employees could have been exposed over the Pell. Because Techno took this risk, with the safety and health of its employees and the lives of its employees, it violated the standard. Now, Techno's argument might have some bearing on whether the violation here was serious or not, whether the judge properly characterized the violation as serious. However, Techno does not challenge this aspect of the judge's finding until a footnote in its reply brief. Therefore, the issue is not properly before the Court. But in case the Court does want to look at the issue further, I'd ask the Court to look at Phelps-Dodgcourt v. Osherick at 725 F. 2nd, 1237. That's Phelps-Dodgcourt v. Osherick at 725 F. 2nd, 1237, where the Court held that a violation, in determining whether a violation is serious, the Court looks at the harm the regulation is intended to prevent, and if that harm is death or serious injury, the violation is serious per se. So Techno failed to provide a clean change area here. It failed to do biological monitoring. It failed to complete an initial determination. It violated the standard. Unless the Court has any further questions, I've completed my presentation. The Court asked the Court to affirm the final order with the exception of the recordkeeping citation. Thank you. Just with the few minutes I have left, I appreciate your time. I'm not sure, Your Honor, about this recordkeeping business. When you look at the – when you look at – this is a long regulation. This is not an easy regulation to understand. When you – but I don't – for a contractor. And so when you look at that regulation, you can only read it and see what it says. When the historical data exception is in D-3, and D-3-3 tells you what you have to do to satisfy that historical data exception, and that's what Technocodings did. Well, then D-5 says you have to document that. Well, Your Honor, D-5 is entitled Negative Initial Determination. What does it say? It says if you're involved in a negative initial determination, that you're supposed to document things. That's correct. That's the point. And there's no documentation. But let me ask you another question. The other side says that what your client did was try to compare an apple and an orange. Let's assume they were dealing with what they said they were dealing with. They were trying to compare exposure with needle guns, with vacuum attachments, to a situation with needle guns. Without vacuum attachments. That is a certain ring to it. How can you compare that? Well, I don't think you can compare it, Your Honor. And that's what they said that you tried to do with historical data. Well, of course, that's exactly what they're going to say. They have no data about that at all. We don't know what happened on the 11th of December. All we know, all we can deal with. Historical data involves vacuum attachments, and we know visit number one, you were using no vacuum attachments. On December 11th, when the inspector went out there for the first time, they were apparently not using vacuum attachments. Right. No question about that. That's all we know. Does the historical data come from a project that was using vacuum attachments? Yes, it does. So how do you compare? I think what you say is, well, look, tell me then. In other words, the time-weighted average is for lead exposures. It's like noise or anything. You weight it on an eight-hour time-weighted average. Everything is based on an eight-hour time-weighted average. If you're running the San Francisco Chronicle news presses, if you've got a lot of high noise for the hour they're running the newspapers, the other seven hours you've got them in a room where there's no noise at all, so it averages out so you don't have an exposure. It's the same way with lead. So we have an inspector that comes onto the job site. She says, well, I didn't see any. She comes there late in the day. I didn't see any attachments. We have no idea what they were doing. We have no idea what they were exposed to. We have no idea how long they were exposed to it. I agree with your point. It's a good point. But the fact of the matter is there has to be evidence. Who was supposed to prove all those points? Was that their requirement or yours? Well, I would hope. I would hope that if a federal agency is charging an employer with a violation, they have the burden of proof. That burden, I think, shifts to the employer if they're trying to establish. I would agree with the court in its decision that Bryson, whatever it was, I would agree with the court there that that burden for historical data shifts to us. But put yourself in the shoes of Technocodings. They do all of these samples. They have exact. You asked, Your Honor, what did they do out there at San Bernardino. I don't think there was an answer. It's the same job. The fact that they may have done it in San Bernardino and they moved on to do it in San Diego, it's the same procedure. They're using the same equipment. They're in the moon suits. They're in respirators. But in San Bernardino, it was two different piers. It was 10 and 7. That's correct. And if you look at all the data, which, of course, nobody really wants, the Secretary doesn't want to admit, is look. Look at the dirt samples as well for both of those piers. Look at those dirt samples. The Secretary doesn't want to address the dirt samples because they show no lead in the dirt to speak of. That's the problem. Now, counsel, you know, their own data at San Diego, which was good data for Mr. Pelletier, who's standing downwind of Mr. Radovich at the time of these samples, what does the data show? No exposure, even approaching the action level. In other words, no one was exposed to anything unsafe at either job, and there's no contrary data to that. Their own data shows that. Mr. Pelletier was exposed to lead below the action level. They did it right at San Bernardino. They did it right at San Diego. The Secretary's own evidence establishes that. Thank you, counsel. Thanks very much.
judges: Schroeder, Trott, Rhoades